**Javanda BECKWITH, Parent and next friend of L.B., a minor, and L.B. individually, Plaintiffs,**

**v.**

**DISTRICT OF COLUMBIA, Defendant.**

**Case No: 15-cv-1284-RCL**

United States District Court, District of Columbia.

Signed 09/15/2016

7. Available at https://www.justice.gov/opcl/ file/793026/download.

Robert Wilson Jones, James E. Brown & Associates, PLLC, Washington, DC, for Plaintiffs.

Veronica A. Porter, Office of the Attorney General for the District of Columbia, Washington, DC, for Defendant.

## MEMORANDUM

ROYCE C. LAMBERTH, United States District Judge

This matter is before the Court on the Report and Recommendation filed by Magistrate Judge Alan Kay on June 27, 2016. The 14-day period during which the parties may file objections to the Report and Recommendation has expired, *see* Local Civil Rule 72.3(b), and neither party has filed objections.

Plaintiffs Javanda Beckwith, parent and next friend of L.B., a minor, and L.B. individually, filed this complaint in August 2015 naming the District of Columbia as the sole defendant. The complaint alleges that the District of Columbia Public Schools ("DCPS") denied Ms. Beckwith's child, L.B., a free appropriate public education ("FAPE") in violation of the Indi-

viduals with Disabilities Education Improvement Act, 20 U.S.C. § 1400 *et seq.* Plaintiffs moved for summary judgment, asking the Court to reverse the Hearing Officer's Determination ("HOD") that DCPS provided L.B. a FAPE. Plaintiffs argued that DCPS denied L.B. a FAPE by: (1) failing to comply with its own guidelines concerning the use of restraint on L.B.; (2) failing to implement L.B.'s IEPs during the 2014-2015 school year; (3) assigning L.B. to a school—Langley Elementary—incapable of implementing L.B.'s IEPS; (4) failing to provide an appropriate IEP in January 2015; and (5) failing to develop an appropriate behavior intervention plan ("BIP"). Defendant filed a cross-motion for summary judgment asking the Court to affirm the HOD.

Magistrate Judge Kay found that the Hearing Officer erred in finding that DCPS's failure to comply with its restraint requirements did not deny L.B. a FAPE, and that DCPS's failure to implement L.B.'s June 2014 and January 2015 IEPs did not deny L.B. a FAPE. Magistrate Judge Kay also found, however, that the Hearing Officer did not err in determining that Langley was an appropriate location of services and capable of implementing L.B.'s IEPs, or that DCPS provided an appropriate IEP in January 2015, or that DCPS's failure to develop a behavior intervention plan did not deny L.B. a FAPE. In sum, L.B. was denied a FAPE when defendant failed to comply with its restraint requirements, and when defendant failed to implement L.B.'s June 2014 and January 2015 IEPs.

Accordingly, Magistrate Judge Kay recommended granting in part and denying in part plaintiffs' motion for summary judgment, and granting in part and denying in part defendant's cross-motion for summary judgment. Specifically, Magistrate Judge Kay recommended granting plaintiffs' motion as to their claims that defendant denied L.B. a FAPE by violating DCPS guidelines on the use of restraint and by failing to implement her June 2014 and January 2015 IEPs. Magistrate Judge Kay recommended denying plaintiffs' motion as to their claims that defendant denied L.B. a FAPE by placing L.B. at Langley for the 2014-2015 school year, by failing to develop an appropriate IEP in January 2015, and by failing to develop a BIP until February 2015. After consideration of the Report and Recommendation of Magistrate Judge Kay, the absence of any party's objection thereto, the entire record before the Court and the applicable law, the Court will adopt Magistrate Judge Kay's Report and Recommendation and grant in part and deny in part plaintiffs' motion for summary judgment, and grant in part and deny in part defendant's cross motion for summary judgment.

A separate order accompanies this memorandum.

### ORDER

For the reasons stated in the accompanying memorandum, it is hereby

**ORDERED** that Magistrate Judge Alan Kay's Report and Recommendation issued June 27, 2016 [20], is **ADOPTED;** and it is further

**ORDERED** that the plaintiffs Motion for Summary Judgement [11] is granted in part, and denied in part; and it is further

**ORDERED** that the defendant's Cross Motion for Summary Judgment [15] is granted in part, and denied in part.

Accordingly, the May 13, 2015 Hearing Officer's Determinations that DCPS's failure to comply with its restraint requirements did not deny L.B. a FAPE, and that DCPS's failure to implement L.B.'s June 2014 and January 2015 IEPs did not deny L.B. a FAPE are hereby **REVERSED.**

The May 13, 2015 Hearing Officer's Determinations that Langley Elementary was an appropriate location of services and capable of implementing L.B.'s IEPs, that DCPS provided an appropriate IEP in January 2015, and that DCPS's failure to develop a behavioral intervention plan did not deny L.B. a FAPE are hereby **AFFIRMED.**

It is hereby **ORDERED** that defendant revise L.B.'s IEP to include appropriate guidelines for the use of restraints on L.B., and that defendant provide compensatory education for the above-listed denials of a FAPE.

Pursuant to Local Rule 54.2(a), it is hereby **ORDERED** that the parties are directed to confer and to attempt to reach an agreement on fee issues. Any motions for attorneys' fees shall be filed no later than 14 days from this date pursuant to Federal Rule of Civil Procedure 54(d)(2)(B).

## REPORT AND RECOMMENDATION

ALAN KAY, UNITED STATES MAGISTRATE JUDGE

Plaintiff Javanda Beckwith complains that the District of Columbia Public Schools ("DCPS") denied her child L.B. a free appropriate public education ("FAPE") in violation of the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* An administrative Hearing Officer found that DCPS adequately provided L.B. a FAPE and accordingly denied Plaintiffs all requested relief. (*See* Hearing Officer's Determination ("HOD") [9-1] at 21.) Ms. Beckwith now moves for summary judgment and asks the Court to overturn the Hearing Officer's Determination ("HOD"). (Pls.' Mot. [12] at 1.) By contrast, Defendant District of Columbia moves the Court to uphold the HOD through its Cross-Motion for Summary Judgment. (Def.'s Cross-Mot. [15] at 1.) United States District Judge Royce C. Lamberth referred this matter to the undersigned for a Report and Recommendation on the pending motions. (J. Lamberth Order [3].) For the reasons discussed below, the undersigned recommends finding that Plaintiffs' Motion is granted in part and denied in part and that Defendant's Cross-Motion is granted in part and denied in part.

## I. BACKGROUND

### A. Statutory Framework

The IDEA "aims to ensure that every child has a meaningful opportunity to benefit from public education." *Boose v. Dist. of Columbia,* 786 F.3d 1054, 1056 (D.C.Cir. 2015). To further that end, the statute requires that "all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).

The statute also requires a school district to ensure that all children residing in that district "who are in need of special education and related services, are identified, located, and evaluated." *Id.* § 1412(a)(3)(A). Once identified, the school district develops an annual individualized education program ("IEP") tailored to that student's personal skills and needs that outlines the appropriate educational services the student will receive. *Id.* § 1414(d)(1)(A); *Sch. Comm. of Burlington v. Dep't of Educ.,* 471 U.S. 359, 368, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1988). In developing a student's IEP, the school district "must ensure that a parent of each child with a disability is a member of any group that makes decisions on the edu-

cational placement of the parent's child." 34 C.F.R. § 300.501(c)(1).

The student's IEP is a comprehensive statement that is reviewed annually and includes annual goals for the student's education, a list of the special education and services that are to be provided to the student, projected dates for the beginning of services, and the criteria for evaluating the student's progress. 20 U.S.C. § 1414(d)(1)(A). The IEP team may determine that the student needs additional "related services"—*i.e.,* non-educational, supportive services, such as physical and occupational therapy and psychological counseling—in order to benefit from special education. *See id.* § 1401(26); 34 C.F.R. § 300.34(a). At a minimum, the IEP must be "reasonably calculated" to provide "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction," *Hendrick Hudson District Board of Education v. Rowley,* 458 U.S. 176, 203–04, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), and the school district must ensure that "special education and related services are made available to the child in accordance with the child's IEP," 34 C.F.R. § 300.323(c).

If a parent objects to the identification, evaluation, or educational placement of her disabled child, or contends that the student is not receiving a FAPE, the parent may seek an "impartial due process hearing" before a Hearing Officer, who issues a determination known as a Hearing Officer's Determination ("HOD"). 20 U.S.C. §§ 1415(f)(1)(A), 1415(b)(6). If a party objects to the HOD, that party may appeal to a D.C. court or federal district court. *See id.* § 1415(i)(2)(A).

### B. Factual Background

L.B. is a nine-year-old student who is eligible for special education and related services. (Administrative Record ("AR") [9] at 3.) In 2011, when L.B. was five-years-old, she was diagnosed with attention deficit hyperactivity disorder ("ADHD"). (AR [9] at 29.) L.B. was prescribed medication for her ADHD but was "on and off" medication from her diagnosis until the summer of 2013 when Ms. Beckwith took her fully off the medication. (AR [9] at 107, [10] at 659–62.) In 2014, when L.B. was eight-years-old, she was also diagnosed with oppositional defiance disorder ("ODD") based on her behavior during the 2013–14 school year. (AR [9] at 118.)

L.B. attended Kimball Elementary for the 2013–14 school year. (AR [9] at 37.) L.B.'s multidisciplinary team ("MDT") initially developed an individualized education program ("IEP") for her in February 2014 after she had been repeatedly suspended and involved in fights with other students. (AR [9] at 70–73, 77.) On June 23, 2014, L.B.'s MDT met for an annual review and revised her IEP to provide 15 hours per week of special education services in reading, 10.5 hours per week of special education services in mathematics, 4 hours per month of behavioral support services, and 1 hour per month of occupational therapy ("OT"). (AR [9] at 141.) L.B.'s IEP also noted that she "now needs a full time out of general education placement." (*Id.*)

On August 18, 2014, DCPS enrolled L.B. at Langley Elementary for the 2014–15 school year. (AR [9] at 146.) L.B. resumed taking her medication for her ADHD until February 2015 when her doctor modified her prescription. (AR [10] at 659–62.) At Langley, L.B.'s schedule was as follows: breakfast from 8:10–8:40; the classroom morning meeting from 8:40–8:50; specialized reading instruction from 8:50–11:15; lunch from 11:15–11:40; recess from 11:40–12:00; specialized math instruction from 12:00–1:45; "specials" or "special electives" (Spanish, art, music, physical education, or

STEM, depending on the day) with the general education students from 1:45–2:30; and finally, classroom enrichment activities from 2:30–3:15. (AR [10] at 778–81.)

According to L.B.'s teacher, Ms. Nickson, throughout L.B.'s first semester at Langley, she was "a wonderful student," who "followed classroom rules" and "got along with her other peers." (AR [10] at 796.) During her first two months at Langley, L.B. was provided all of the OT and behavioral support services required by her June 2014 IEP. (AR [9] at 230–38, 243–53.)

On October 29, 2014, however, L.B. became defiant during her transition from math to her special elective, causing two teachers to have to physically restrain her. (AR [10] at 796–97.) L.B. attributed her behavioral problems on that day to a failure to take her medication; however, Ms. Beckwith often secretly administered L.B.'s medicine by hiding it in her food, so the record is unclear regarding whether L.B. had taken her medicine that morning. (AR [9] at 248, [10] at 646–47, 808, 936–38.) This incident was recorded in the Service Tracker for L.B.'s behavioral support services but not in L.B.'s IEP progress reports or in her January 2015 IEP. (AR [9] at 248, 266, 277, 334.) Shortly after this incident, Langley provided L.B. only 3.25 of the 4 required hours of behavioral support services in November and only 3 of the 4 required hours in December. (AR [9] at 243–53.)

On January 6, 2015, L.B.'s MDT reconvened for an annual review. (AR [9] at 271–80.) The MDT decided to revise her IEP to provide an additional 0.75 hours per week of special education services, thereby increasing the total from 25.5 hours per week to 26.25 hours per week. (*Id.*) At the MDT meeting, L.B.'s occupational therapist recommended that L.B.'s OT services be discontinued; because Ms.

Beckwith objected, L.B.'s IEP was revised to provide 20 minutes per month instead. (*Id.*) Similarly, L.B.'s social worker recommended that L.B.'s behavioral support services be reduced from 4 hours per month to 3 hours; over Ms. Beckwith's objection, L.B.'s IEP was revised to provide 3 hours per month of behavioral support services. (AR [9] at 271–80, [10] at 931, 941.) The MDT agreed that L.B. should remain at Langley and that she still needed a full time out of general education placement. (AR [9] at 271–80.)

Throughout the spring semester, Langley provided L.B. with at least 20 minutes of OT and at least 3 hours of behavioral support per month. (AR [9] at 239–42, 254–62.) Nevertheless, shortly after the January MDT meeting, Ms. Beckwith received phone calls after L.B. exhibited negative behavior on nine occasions. (AR [9] at 292.)

In addition, Langley staff physically restrained L.B. on five occasions in January and February 2015 due to behavioral problems. On January 22, 2015, L.B. was physically restrained and escorted to the dean's office after she refused to enter her classroom and became belligerent toward the staff. (AR [9] at 290, [10] at 802–03.) On February 5, L.B. was physically restrained after pushing her behavioral technician, Ms. Davis. (AR [9] at 311, [10] at 803.) Ms. Nickson and Ms. Beckwith both testified that there were "three other times" after February 5 when L.B. was physically restrained. (AR [10] at 609, 803–04.)

Moreover, L.B. was suspended on three occasions in January and February 2015. (AR [10] at 807.) As a consequence, Langley reconvened L.B.'s MDT, who developed a behavior intervention plan ("BIP") for L.B. on February 24, 2015. (AR [9] at 321.)

On February 27, 2015, Ms. Beckwith filed a due process complaint alleging that

DCPS denied L.B. a FAPE in its (1) failure to implement L.B.'s June 2014 and January 2015 IEPs by failing to provide sufficient specialized instruction; (2) failure to provide L.B. an appropriate placement where her June 2014 IEP could be implemented; (3) failure to provide L.B. an appropriate IEP in January 2015 by reducing her hours of OT and behavioral support services; (4) failure to develop a BIP for L.B. until February 2015; and (5) failure to adhere to DCPS guidelines concerning the use of restraint. (AR [9] at 335–42.) On April 29, 30, and May 7, 2015, the Administrative Hearing was held. (Hearing Officer's Determination ("HOD") [9-1] at 1.) On May 13, 2015, the Hearing Officer found in favor of DCPS on all issues and accordingly denied Plaintiffs all requested relief. (HOD [9-1] at 21.) Ms. Beckwith now appeals the Hearing Officer's Determination.

## II. LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is to be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party must set forth the foundation for its motion and identify segments of the record demonstrating an absence of genuine dispute of material facts. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When ruling on a motion for summary judgment, a court must draw all inferences in a light most favorable to the non-moving party. *McCready v. Nicholson*, 465 F.3d 1, 7 (D.C.Cir.2006). Because "[c]redibility determinations, the weighing of inferences and the drawing of inferences from the facts are jury functions," a court must

deny summary judgment to the extent that reasonable minds could differ over the import of the evidence. *Anderson*, 477 U.S. at 250–51, 255, 106 S.Ct. 2505.

In an IDEA case, a court must review the administrative record, hear additional evidence at the request of a party, and base its decision "on the preponderance of the evidence," granting such relief as it deems appropriate. 20 U.S.C. § 1415(i)(2)(C). A court gives "due weight" to the HOD and does not substitute its own view of sound educational policy for that of the Hearing Officer. *Rowley*, 458 U.S. at 206, 102 S.Ct. 3034; *see also Lyons v. Smith*, 829 F.Supp. 414, 418 (D.D.C. 1993) (stating that the court must "afford some deference to the expertise of the hearing officer and school officials responsible for the child's education"). Thus, if a court overturns the HOD, it "must at least explain its basis for doing so." *Kerkam v. McKenzie ("Kerkam I")*, 862 F.2d 884, 887 (D.C.Cir.1988). An HOD "without reasoned and specific findings deserves little deference." *Kerkam v. Superintendent of D.C. Pub. Schs. ("Kerkam II")*, 931 F.2d 84, 87 (D.C.Cir.1991) (internal quotation marks and citation omitted).

The party challenging the HOD bears the burden of persuasion and must demonstrate by a preponderance of evidence that the Hearing Officer erred. *See Kerkam I*, 862 F.2d at 887 ("[A] party challenging the administrative determination must at least take on the burden of persuading the court that the hearing officer was wrong."). If neither party requests that the Court hear additional evidence, the Court may determine the case on summary judgment based on the administrative record. *Heather S. v. Wisconsin*, 125 F.3d 1045, 1052 (7th Cir.1997). Here, neither party has requested that the Court hear additional evidence; thus, the under-

signed bases this recommendation on its review of the Administrative Record.

## III. ANALYSIS

Plaintiffs claim that DCPS denied L.B. a FAPE by (1) failing to comply with its own guidelines concerning the use of restraint on L.B.; (2) failing to implement L.B's IEPs during the 2014–15 school year because DCPS did not provide the proper amount of hours of special education; (3) placing L.B. at Langley, an inappropriate location due to its inability to implement her IEP; (4) failing to provide L.B. an appropriate IEP in January 2015 because the IEP developed inappropriately reduces behavioral services and OT services; and (5) failing to develop a BIP for L.B. until February 2015.[1] (Pls.' Mot. [12-1] at 8.) These claims will be addressed in turn.

### A. The Hearing Officer Erred in Finding that DCPS's Failure to Comply with Its Restraint Requirements Did Not Deny L.B. a FAPE

█ Plaintiffs contend that the Hearing Officer erred in finding that DCPS's violations of its policy regarding the use of physical restraint did not deny L.B. a FAPE because the violations deprived L.B. of important instructional time and impeded Ms. Beckwith's right to participate in the decision-making process regarding L.B.'s education. (Pls.' Mot. [12] at 32.)

DCPS guidelines state that physical restraint should be employed only as a last resort after other de-escalation methods have failed and only when the student exhibits imminent risk of injury to those around her. (AR [10] at 501.) The physical restraint should "last only as long as the risk of imminent injury is present." (*Id.*) After physical restraint is used on a student, the school must notify that student's parents within one hour, send a written report to that student's parents within one school day, and convene an MDT meeting that includes "all of the individuals who were involved" in restraining the student within five days. (AR [10] at 504.)

In this case, Langley staff physically restrained L.B. on at least six separate occasions and did not follow DCPS's restraint policy. On October 29, 2014, L.B. became defiant during her transition from math to her special elective, causing two teachers to have to physically restrain her. (AR [10] at 796–97.) Ms. Beckwith was notified via phone, but no written report was sent, and no meeting was convened. (AR [10] at 602–03, 664, 808.)

On January 22, 2015, L.B. was physically restrained after she refused to enter her classroom when lunch period ended and became belligerent toward the staff. (AR [9] at 290, [10] at 802–03.) After L.B. was restrained, she was escorted to the dean's office and placed in a different classroom for the remainder of the school day. (AR [9] at 290.) L.B. told her therapist, Ms. Dessin, about this incident, and Ms. Dessin filed a report with the Child and Family Services Agency. (AR [9] at 371, [10] at 665–66.) It is unclear whether Ms. Beckwith received notification about this incident from Langley or from Ms. Dessin's report. (*Id.*) At the request of Ms. Beckwith's counsel, Langley sent a written report of the incident to Ms. Beckwith on January 28, five days later than the deadline set by DCPS's restraint policy. (AR [9] at 287–90.) No meeting was convened. (*Id.*)

---

1. Plaintiffs' Motion actually lists the failure to adhere to DCPS guidelines concerning the use of restraint as their fifth claim. The undersigned labeled Plaintiffs' fifth claim concerning the restraint policy as their first claim because the analysis clarifies the legal standards applicable to the remaining claims.

On February 5, 2015, L.B. was physically restrained after pushing her behavioral technician, Ms. Davis, during the transition from lunch to the classroom. (AR [9] at 311, [10] at 803.) After L.B. was restrained, she was placed in a different classroom for the remainder of the school day. (AR [9] at 311.) Ms. Beckwith was not notified by Langley, but L.B. told Ms. Beckwith that she had been restrained after she came home from school that day. (AR [10] at 604–05.) Again, at the request of Ms. Beckwith's counsel, Langley staff sent a written report of the incident to Ms. Beckwith on February 6. (AR [9] at 309–14.) After contacting Langley about reconvening the MDT, Ms. Beckwith and her counsel agreed to attend an MDT meeting on February 24, fourteen days later than the deadline set by DCPS's restraint policy. (*Id.*) At this meeting, the MDT developed a BIP for L.B., but not everyone who had restrained L.B. in October, January, and February was present. (AR [10] at 672.)

L.B.'s teacher, Ms. Nickson, and Ms. Beckwith both testified that there were "three other times" after February 5 when L.B. was physically restrained. (AR [10] at 607–09, 803–04.) The record is unclear whether Ms. Beckwith received verbal notification of or written reports concerning these incidents, but there is no dispute that no meetings were convened. (AR [9] at 372–73, [10] at 607–09, 805.)

The Hearing Officer determined "that DCPS did violate its own policy in regard to restraining the Student." (HOD [9-1] at 19.) The Hearing Officer found that L.B. was restrained in violation of DCPS guidelines on January 22, 2015, because she "was not putting anyone at risk of imminent harm." (HOD [9-1] at 19.) Moreover, the Hearing Officer found that Langley failed to send written reports to Ms. Beckwith as required by DCPS guidelines and

failed to convene MDT meetings as required by DCPS guidelines. (HOD [9-1] at 20.) These findings are not in dispute. (*See* Def.'s Cross-Mot. [15] at 34.)

However, the Hearing Officer found that these violations did not constitute a denial of FAPE. (HOD [9-1] at 21.) He reasoned that these violations were procedural and therefore only warranted relief if they " 'affected the student's substantive rights.' " (*Id.* (quoting *Lesesne v. Dist. of Columbia*, 447 F.3d 828, 834 (D.C.Cir. 2006)).) He denied Plaintiffs relief because he determined that Plaintiffs had failed to establish that DCPS's violations "denied educational benefit" to L.B. (HOD [9-1] at 20.) Plaintiffs challenge the Hearing Officer's conclusion that DCPS's violations did not constitute a denial of FAPE. (Pls.' Mot. [12] at 26.)

In *Rowley*, the Supreme Court set forth a two-part test for assessing when a school district has violated the IDEA: "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 206–07, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). The first question is procedural while the second is substantive. *See id.* "In matters alleging a procedural violation, a hearing officer may find that a child did not receive a free appropriate public education only if the procedural inadequacies—(I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decisionmaking [sic] process regarding the provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii); *see also Lesesne*,

447 F.3d at 834 ("[A]n IDEA claim is viable only if those procedural violations affected the student's substantive rights."). In matters alleging a substantive violation, a hearing officer may find that the student was denied a FAPE only if the school district failed to meet the IDEA's minimal requirement that the student's IEP be "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207, 102 S.Ct. 3034.

Plaintiffs first argue that the Hearing Officer erred in determining that Defendant's violations of DCPS guidelines were procedural rather than substantive. (Pls.' Mot. [12] at 29–30.) Specifically, Plaintiffs argue that, because the IDEA defines FAPE as "special education and related services that . . . meet the standards of the State educational agency," 20 U.S.C. § 1401(9), any deviation from state standards is, by definition, a substantive denial of FAPE. (Pls.' Mot. [12] at 29–30). Plaintiffs' argument is misguided. As interpreted by *Rowley*, the IDEA grants limited substantive rights and, instead, places great emphasis on procedural rights. *See* 458 U.S. at 205, 102 S.Ct. 3034 ("When the elaborate and highly specific procedural safeguards embodied in § 1415 are contrasted with the general and somewhat imprecise substantive admonitions contained in the Act, we think that the importance Congress attached to these procedural safeguards cannot be gainsaid."); Jon Romberg, *The Means Justify the Ends: Structural Due Process in Special Education Law*, 48 Harv. J. on Legis. 415, 416 (2011) ("The IDEA, as interpreted by *Rowley*, views special education law through a strongly proceduralist lens: *Rowley* dictates that the process by which the IEP is created is of far more importance than the substantive content of the resulting IEP."). Recognizing the judiciary's lack of expertise and statutory authority to make substantive educational deci-

sions, the Supreme Court believed "that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *Rowley*, 458 U.S. at 206, 208, 102 S.Ct. 3034. For this reason, the Supreme Court characterized the IDEA's substantive provisions as limited to an analysis of whether a student's IEP was appropriate—that is, whether it was "reasonably calculated" to provide "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Id.* at 203–04, 102 S.Ct. 3034. Thus, with respect to this case, the Hearing Officer properly categorized Defendant's violations of DCPS guidelines as procedural violations because they do not concern the appropriateness of L.B.'s IEP. (HOD [9-1] at 20–21.)

Plaintiffs also argue that, even if DCPS's violations were procedural, the Hearing Officer erred in finding that the violations did not deny L.B. an educational benefit by depriving her of valuable instruction time. (Pls.' Mot. [12] at 32–33.) The Hearing Officer grappled with this issue when making his determination. (HOD [9-1] at 20.) While acknowledging that L.B.'s "most serious outbursts have not been handled excellently," the Hearing Officer ultimately concluded that "there is no showing that the restraints had any substantive impact on [L.B.]'s education" and thus no denial of FAPE. (*Id.*) After giving "due weight" to the Hearing Officer's Determination ("HOD"), the undersigned agrees. There is insufficient evidence to support the claim that the instructional time L.B. missed while being restrained deprived her of educational benefits.

Finally, Plaintiffs argue that, even if DCPS's violations were procedural, they denied L.B. a FAPE because they denied

Ms. Beckwith the opportunity to participate in the decisionmaking process concerning L.B.'s education. (Pls.' Mot. [12] at 32–33.) Specifically, Plaintiffs argue that if DCPS had convened meetings within five days, as required by DCPS guidelines, Ms. Beckwith would have had "an important opportunity to investigate and understand L.B.'s behavior problems, and discuss positive behavior interventions that could have eliminated the need for further restraint." (Pls.' Mot. [12] at 33.) The Hearing Officer failed to address this claim, thereby rendering his decision of little value on this issue. *Kerkam II*, 931 F.2d at 87 (internal quotation marks and citation omitted). Accordingly, the Court must determine whether DCPS's violations "significantly impeded [Ms. Beckwith's] opportunity to participate in the decisionmaking [sic] process regarding the provision of a free appropriate public education to [L.B.]." 20 U.S.C. § 1415(f)(3)(E)(ii)(II).

■ Parental participation is a touchstone of the IDEA. "Congress repeatedly emphasized throughout the Act the importance and indeed the necessity of parental participation in both the development of the IEP and any subsequent assessments of its effectiveness." *Honig v. Doe*, 484 U.S. 305, 311, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988); *see also Rowley*, 458 U.S. at 208, 102 S.Ct. 3034 ("Congress sought to protect individual children by providing for parental involvement in the development of state plans and policies and in the formulation of the child's individual educational program."). Parental rights under the IDEA are not merely derivative of students' rights. Instead, the "IDEA grants parents independent, enforceable rights." *Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 533, 127 S.Ct. 1994, 167 L.Ed.2d 904 (2007). Therefore, if DCPS's violations "significantly impeded" Ms. Beckwith's rights, the Court may find a

denial of FAPE even if there is insufficient evidence of an impact to L.B.'s educational rights. 20 U.S.C. § 1415(f)(3)(E)(ii)(II); *see also Winkelman*, 550 U.S. at 531–32, 127 S.Ct. 1994 ("The [IDEA]'s procedural and reimbursement-related rights are intertwined with the substantive adequacy of the education provided to a child, and it is difficult to ·disentangle the provisions in order to conclude that some rights adhere to both parent and child while others do not." (citations omitted)); *Eley v. Dist. of Columbia*, No. 11–309, 2012 WL 3656471, at *9 (D.D.C. Aug. 24, 2012) ("[E]xcluding the plaintiff in the 2010–11 IEP update process violated an important procedural safeguard and seriously impaired the right of the parent to participate in the process. This violation was· thus another denial of FAPE.").

In this case, the undersigned believes DCPS significantly impeded Ms. Beckwith's opportunity to participate in the decision-making process concerning L.B.'s FAPE. After a. student is physically restrained, DCPS guidelines require a school to notify parents within one hour, send a written report to parents within one school day, and convene an MDT meeting that includes "all of the individuals who were involved" in restraining the student within five days. (AR [10] at 504.) The purpose of the required meeting is "to discuss the restraint or seclusion and *how to prevent it in the future*." (*Id.* (emphasis added).) Although a single violation of DCPS guidelines would certainly not have "significantly impeded" Ms. Beckwith's rights, DCPS's repeated violations of its own restraint policy throughout the 2014–15 school year · did. 20 U.S.C. § 1415(f)(3)(E)(ii)(II); (*see also* AR [10] 599, 609.) Every time Langley staff restrained L.B., they failed to convene an MDT meeting within five days. (AR [9] at 287–90, 309–14, 372–73, [10] at 603, 610, 805.) Every time Langley staff restrained L.B., they would only send Ms. Beckwith a

written report at her counsel's insistence. (AR [9] at 287–90, 309–14, [10] at 603.) Instead of receiving notice within one hour, Ms. Beckwith frequently learned about the use of restraints from L.B. after she returned home. (AR [10] at 599, 604–05, 609.)

Defendant argues that Ms. Beckwith's rights were not impacted because she still participated in the MDT meeting on February 24, 2015. (Def.'s Cross-Mot. [15] at 37.) However, Ms. Beckwith testified that, even when DCPS convened a meeting on February 24, 2015, at the insistence of her attorney, some of the members of Langley's staff who had restrained L.B. did not attend, as required by DCPS guidelines. (AR [10] at 504, 672.) Had they been present, Ms. Beckwith would have had an opportunity to hear about the incidents of restraint from the participants themselves, which was especially important because L.B. often described the incidents differently than Langley's written reports. (AR [10] 671–73.) This additional detail likely would have assisted the MDT in "prevent[ing] [restraint] in the future" and in collaborating with Langley staff who had restrained L.B. about alternatives to restraint that they ought to use on L.B. (AR [10] at 504.) Thus, the undersigned believes Plaintiffs have demonstrated that Ms. Beckwith's rights were significantly impeded by DCPS's procedural violations of its restraint policy and that this impediment resulted in a denial of FAPE.

### B. The Hearing Officer Erred by Finding that DCPS's Failures to Implement L.B.'s June 2014 and January 2015 IEPs Did Not Deny Her a FAPE

██ Plaintiffs claim that the Hearing Officer erred in determining that L.B. was not denied a FAPE from DCPS's failure to implement her June 2014 and January 2015 IEPs. (Pls.' Mot. [12] at 12.) Plaintiffs argue that the Hearing Officer's finding that "the record does not establish by a preponderance of the evidence that the Student did *not* receive" 25.5 hours per week of specialized instruction in the fall and 26.25 hours per week of specialized instruction in the spring is contradicted by the record. (HOD [9-1] at 14 (emphasis original); Pls.' Mot. [12] at 17.)

At the Administrative Hearing, L.B.'s teacher, Ms. Nickson, testified that her students had breakfast from 8:10–8:40, morning meeting from 8:40–8:50, specialized reading instruction from 8:50–11:15, lunch from 11:15–11:40, recess from 11:40–12:00, specialized math instruction from 12:00–1:45, special electives from 1:45–2:30, and enrichment activities from 2:30–3:15. (AR [10] at 778–81, 841–42.) On its face, this schedule results in 12.1 hours of specialized reading instruction per week and 8.75 hours of specialized math instruction per week, totaling 20.85 hours of specialized instruction per week.[2]

Ms. Nickson's testimony also indicated that this schedule was somewhat fluid. On direct examination, she testified that the morning meeting from 8:40–8:50, which typically involved review of "things like … the day, the time, the weather," also contained "some components of instruction," such as review of figurative language. (AR [10] at 778.) On cross-examination, she testified that part of the specialized reading instruction from 8:50–9:15 was "setup to start [the] reading block," meaning that "hard-core instruction" took place from 9:15–11:15, rather

---

**2.** The undersigned did not include breakfast, morning meeting, lunch, recess, special electives, or enrichment time in this calcula- tion because they typically do not consist of specialized instruction time.

than from 8:50–11:15. (AR [10] at 825.) She also testified that the enrichment activities varied, sometimes consisting of instruction in "reading, writing, science, it just—it depends." (AR [10] at 780.) This means that L.B. might have received some of her required specialized instruction during the enrichment period.

In January 2015, the multidisciplinary team ("MDT") revised L.B.'s IEP to include an additional 0.75 hours of specialized instruction, thereby requiring a total of 26.25 hours per week of specialized instruction. (AR [9] at 271–80.) Despite this revision, L.B. remained in Ms. Nickson's classroom, and her schedule was not modified after this meeting to implement the additional time required by her revised IEP. (AR [10] at 844.)

Based on Ms. Nickson's testimony, Plaintiffs contend that the Hearing Officer failed to correctly calculate the hours of specialized instruction that L.B. received. (Pls.' Mot. [12] at 12.) Plaintiffs argue that L.B. only received specialized reading instruction from 9:15–11:15, which totals 2 hours per day, because 8:50–9:15 was preparation and not instructional time. (Pls.' Mot. [12] at 15–16.) Over the course of one week, this totals 10 hours, which is a 5-hour shortfall from L.B.'s requirement that she receive 15 hours of specialized reading instruction per week. (Id.) Similarly, Plaintiffs contend that L.B. only received specialized math instruction from 12:00–1:45, which totals 1.75 hours per day. (Id.) Over the course of one week, this totals 8.75 hours, which is a 1.75-hour shortfall from L.B.'s requirement that she receive 10.5 hours of specialized math instruction per week. (Id.) Thus, in total, L.B. only received 18.75 of the required 25.5 hours per week of specialized instruction (a shortfall of 6.75 hours). (Id.) This 6.75-hour per week shortfall grew to a 7.5-hour per week shortfall after L.B.'s IEP

was revised to require 26.25 hours per week of specialized instruction instead of 25.5 hours per week. (Pls.' Mot. [12] at 16.)

Defendant responds that Plaintiffs fail to acknowledge the fluidity of L.B.'s schedule. (Def.'s Cross-Mot. [15] at 20.) Specifically, Defendant argues that the reading block was from 8:50–11:15 because specialized instruction is not limited to the period of "hard core" instruction. (Id.) This would add 0.4 hours per day to Plaintiffs' asserted total of 2 hours for specialized reading instruction. Defendant also asserts that up to half of the enrichment period might have been dedicated to reading instruction and up to half dedicated to math instruction. (Id.) This means the 0.75-hour enrichment period would add 0.375 hours per day to Plaintiffs' asserted total of 2 hours for specialized reading instruction and add 0.375 hours per day to Plaintiffs' asserted total of 1.75 hours for specialized math instruction. Over the course of one week, this would bring the total of specialized reading instruction to nearly 14 hours, rather than 10 hours, and the total of specialized math instruction to 10.6 hours, rather than 8.75 hours. (Def.'s Cross-Mot. [15] at 20–21.) Accordingly, DCPS would only have failed to provide 1 required hour of specialized instruction per week, which would grow to a 1.75-hour per week shortfall after L.B.'s IEP was revised to require 26.25 hours per week of specialized instruction instead of 25.5 hours per week.

The Hearing Officer determined that "the record does not establish by a preponderance of the evidence that the Student did *not* receive" 25.5 hours per week of specialized instruction in the fall and 26.25 hours per week of specialized instruction in the spring. (HOD [9-1] at 14 (emphasis original).) However, there is no question that the Hearing Officer erred by finding that L.B. was receiving the 25.5 hours of specialized instruction required by her

June 2014 IEP and the 26.25 hours of specialized instruction required by her January 2015 IEP—both parties agree that L.B. received less than 25.5 hours per week of specialized instruction, though they disagree on the amount of the shortfall. (*See* Def.'s Cross-Mot. [15] at 22–23.) Because the Hearing Officer incorrectly determined that there was no shortfall, he made no "reasoned and specific findings" on the merits of Plaintiffs' failure to implement claim; thus, his decision "deserves little deference." *Kerkam II*, 931 F.2d at 87 (internal quotation marks and citation omitted).

The question remains, though, whether the failure to provide the hours of specialized instruction required by L.B.'s IEP denied her a FAPE. Because a failure to implement is a procedural violation under the IDEA, the "hearing officer may find that a child did not receive a FAPE only if the procedural inadequacies ... caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii)(III); *see also Shelton v. Maya Angelou Pub. Charter Sch.*, 578 F.Supp.2d 83, 102–03 (D.D.C. 2008) (assessing a failure to implement claim as a procedural violation); David Ferster, *Broken Promises: When Does a School's Failure to Implement an Individualized Education Program Deny a Disabled Student a Free and Appropriate Public Education*, 28 Buff. Pub. Interest L.J. 71, 99 (2009) ("Implementation is essentially a procedural IDEA requirement. It involves the school district fulfilling its promise to provide the services agreed upon in the IEP meeting.").

■ To establish a deprivation of educational benefits, a moving party "must show more than a *de minimis* failure to implement all elements of that IEP, and, instead, must demonstrate that the school board or other authorities failed to implement substantial or significant provisions

of the IEP." *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir.2000); *see also Lesesne v. Dist. of Columbia*, 447 F.3d 828, 834 (D.C.Cir.2006) ("[A]n IDEA claim is viable only if those procedural violations affected the student's substantive rights."). To meet this standard, a moving party need not prove that the student suffered "educational harm" because "the Court has no way of knowing how much *more* progress" a student might have made in the absence of a failure to implement. *Wilson v. Dist. of Columbia*, 770 F.Supp.2d 270, 275, 276 n. 2 (D.D.C. 2011) (emphasis original).

Generally, in analyzing whether a student was deprived of an educational benefit, "courts ... have focused on the proportion of services mandated to those actually provided, and the goal and import (as articulated in the IEP) of the specific service that was withheld." *Wilson*, 770 F.Supp.2d at 275. For example, in *Sumter County School District 17 v. Heffernan*, the court held that a 33% gap of 60 minutes per day between the required and provided hours of applied behavioral analysis therapy was substantial. 642 F.3d 478, 486 (4th Cir.2011). On the other hand, in *Savoy v. District of Columbia*, the court held that a 3% gap of 10 minutes per day between the required and provided hours of specialized instruction was not substantial. 844 F.Supp.2d 23, 34–35 (D.D.C.2012).

In addition, courts typically refuse to permit a school "merely to write up an IEP without any requirement of implementation." *Colon–Vazquez v. Dep't of Educ.*, 46 F.Supp.3d 132, 144 (D.P.R.2014). For example, in *Colon–Vazquez*, the student's IEP required his school to provide him "with special education services in its resource room." *Id.* The court held that the school's unexplained delay in hiring a replacement resource room instructor to

implement the student's IEP after the previous instructor had resigned constituted a material failure to implement. *Id.* at 147; *see also Wilson*, 770 F.Supp.2d at 276 (holding that an unexplained failure to provide transportation was a material failure to implement, regardless of the student's demonstrated academic progress throughout the year).

In this case, Plaintiffs contend that there was a shortfall of 6.75 hours per week between L.B.'s required and provided hours of specialized instruction. (Pls.' Mot. [12] at 16.) This amounts to a 26% gap, which widened to 29% after L.B.'s January 2015 IEP revisions were not implemented. Defendant responds that the shortfall varied between 1 hour and 4.75 hours, depending whether the weekly enrichment time of 3.75 hours per week is included in the calculation. (Def.'s Cross-Mot. [15] at 20.) This amounts to a gap ranging between 4% and 19%, which widened to 7% and 21%, respectively, after L.B.'s January 2015 IEP revisions were not implemented. Defendant further claims that any discrepancy is irrelevant because L.B. received all of the occupational therapy ("OT") and behavioral support services required by her June 2014 IEP. (Def.'s Cross-Mot. [15] at 23.)

The undersigned believes that Defendant's failures to fully implement L.B.'s June 2014 and January 2015 IEPs denied her a FAPE. First, in January 2015, L.B.'s MDT increased her required hours of specialized instruction from 25.5 per week to 26.25 per week. (AR [9] at 271–80.) Presumably, L.B.'s MDT drafted this revision for a reason. *See Catalan v. Dist. of Columbia*, 478 F.Supp.2d 73, 76 (D.D.C.2007) ("[T]he *Bobby R.* standard should not be read to allow educators to distinguish in the abstract between important and unimportant IEP requirements. . . . To the contrary, all the requirements in an IEP are

significant."). However, Defendant did not attempt to revise L.B.'s schedule after her January 2015 IEP increased her specialized instruction requirement to 26.25 hours per week. (AR [10] at 844.) Defendant has also provided no explanation to demonstrate that its "failure to follow the IEP's requirements to the letter was excusable under the circumstances." *Catalan*, 478 F.Supp.2d at 76.

Second, Defendant's method of calculating its lower estimate that L.B. missed 1 hour of required specialized instruction each week is questionable. Ms. Nickson testified that the enrichment period varied in focus, sometimes containing instruction in "reading, writing, science, it just—it depends." (AR [10] at 780.) Defendant relies solely on this statement to argue that the enrichment period might have been dedicated to 22.5 minutes per day of reading instruction and 22.5 minutes per day of math instruction. (Def.'s Cross-Mot. [15] at 20–21.) Notably absent from Ms. Nickson's testimony, however, is any indication that the enrichment period included math instruction. (*See* AR [10] at 780.) Moreover, because Ms. Nickson's testimony indicates that the focus of the enrichment period varied from day to day, Defendant's consistent inclusion of the enrichment period when calculating the hours of specialized reading instruction that L.B. received each week is similarly dubious.

After excluding Defendant's lower estimate that is unsupported by the record, the undersigned finds that Defendant's upper estimate that L.B. missed 4.75 hours of required instruction each week is more plausible. (Def.'s Cross-Mot. [15] at 20–21.) Thus, L.B. most likely missed between Defendant's upper estimate of 4.75 hours and Plaintiffs' estimate of 6.75 hours of required instruction each week during the fall semester. (*See* Pls.' Mot. [12] at 16; Def.'s Cross-Mot. [15] at 20–21.) This

range increased to between 5.5 and 7.5 hours each week after L.B.'s IEP was revised on January 6, 2015. (AR [9] at 271–80.)

Although the shortfalls in this case are proportionally less than the 33% gap that was held to be material in *Heffernan*, they are not minimal. For DCPS, the fall semester is approximately 17 weeks long and the spring approximately 23 weeks long. *See* D.C. Pub. Schs., *Revised DCPS Calendar: School Year 2014–2015* (2015).[3] Thus, L.B. missed between 207.25 and 287.25 hours of required instruction during the 2014–15 school year. L.B. did display significant educational progress during her fall semester, (AR [10] at 792–95), but such progress "does not excuse DCPS's failure to provide a service that [L.B.]'s IEP team felt was 'required' for [her] continued development," *Wilson*, 770 F.Supp.2d at 276. Taken together, the undersigned believes that these substantial procedural failures deprived L.B. of educational benefits and thus denied her a FAPE.

### C. The Hearing Officer Did Not Err in Determining that Langley Was an Appropriate Location of Services and Capable of Implementing L.B.'s IEPs

█ Plaintiffs contend that the Hearing Officer erred in finding that Langley was an appropriate location of services and capable of implementing L.B.'s IEPs. (Pls.' Mot. [12] at 18.) Specifically, Plaintiffs contend that the Hearing Officer's erroneous finding that L.B.'s IEPs were fully implemented at Langley caused him also erroneously to find that Langley was an appropriate placement. (Pls.' Mot. [12] at 18.) Plaintiffs further argue that the Hearing Officer incorrectly equated the require-

ment that L.B. receive "a full time out of general education placement" with the specific hourly requirements in her IEPs. (Pls.' Mot. [12] at 17.)

█ In order to prevail on an inappropriate placement claim, Plaintiffs must show that Langley "*cannot* appropriately implement [L.B.]'s current IEP." *Hinson v. Merritt Educ. Ctr.*, 579 F.Supp.2d 89, 104 (D.D.C.2008) (emphasis added); *see also T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 420 (2d Cir.2009) (holding that a school district may not "assign a child to a school that *cannot* satisfy the IEP's requirements" (emphasis added)). An inappropriate placement claim may also succeed if the student's placement is not "the least restrictive educational environment" appropriate for that student. *Branham v. Dist. of Columbia*, 427 F.3d 7, 12 (D.C.Cir.2005); *see also Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 993 (1st Cir.1990) ("Correctly understood, the correlative requirements of educational benefit and least restrictive environment operate in tandem to create a continuum of educational possibilities."). The least restrictive environment is that in which, "[t]o the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled." 20 U.S.C. § 1412(a)(5)(A).

Plaintiffs first argue that Langley was incapable of providing the 25.5 hours per week of specialized instruction required by L.B.'s IEP because Langley failed to provide those hours. (Pls.' Mot. [12] at 18.) Aside from this tautological argument, Plaintiffs have provided no evidence to support their argument that Langley was *incapable* of implementing L.B.'s IEP. (*See* Pls.' Opp'n to Def.'s Cross-Mot. [18]

---

**3.** *See* D.C. Pub. Schs., *Revised DCPS Calendar: School Year 2014–2015* (2015), available at http://dcps.dc.gov/sites/default/files/dc/sites/ dcps/publication/attachments/REVISED% 20School% 20Year% 2020142015% 20Full% 20Calendar% 20update.pdf.

at 7.) L.B.'s IEP required specialized education in reading and math, as well as behavioral support services and occupational therapy ("OT"). (AR [9] at 141.) Langley offered these services to its students that required them. (*See* AR [9] at 230–62, [10] at 778–81.) Thus, Plaintiffs have not carried their burden of proof on this argument.

Plaintiffs next contend that L.B.'s placement at Langley was inappropriate because her IEP required that she receive "a full time out of general education placement," and instead, L.B. received her lunch, recess, and special electives in the general education setting. (Pls.' Mot. [12] at 17.) Although Plaintiffs' pleadings cite no authority upon which their understanding of the phrase "full time out of general education placement" is based, Plaintiffs contend that the phrase "full time" ought to be interpreted literally so as to preclude L.B. from being placed with the general education students at any point throughout the day. (Pls.' Opp'n to Def.'s Cross-Mot. [18] at 6–7.)

As Plaintiffs appear to be aware, their literal definition of the phrase "full time out of general education placement" is mistaken. (*See* AR [10] at 1006 (In closing arguments, Plaintiffs' counsel stated that "D.C. policy guidelines consider anything over 20 hours of specialized instruction to be a fulltime classroom setting.").) DCPS defines any requirement of at least 20 hours per week of special education services to be a full time out of general education placement. *See* D.C. Pub. Sch. Office of Specialized Instruction, *Programs & Resources Guide for Staff* 4 (2014) (defining "full-time" as requiring a "special education classroom for 20 or more hours of

specialized instruction per week outside the general education classroom").[4] Accordingly, the Hearing Officer correctly determined that the full-time requirement was not a separate requirement from the specific hourly requirements in L.B.'s IEPs. (HOD [9-1] at 14.)

The evidence suggests that Langley was also an appropriate location of services because it was the least restrictive environment for L.B. At the January 6, 2015, MDT meeting, no one expressed concern that L.B. was attending lunch, recess, and special electives with the general education students. (AR [10] at 643, 818–19.) In addition, Ms. Beckwith permitted L.B. to join an after-school cheerleading program with the general education students. (AR [10] at 820–21.) This suggests that permitting L.B. to interact with the general education students provided the least restrictive environment available because L.B. could receive her specialized instruction and still be, "[t]o the maximum extent appropriate, ... educated with children who are not disabled." 20 U.S.C. § 1412(a)(5)(A). Thus, the undersigned recommends that the Court uphold the Hearing Officer's finding that L.B.'s placement at Langley was appropriate.

**D. The Hearing Officer Did Not Err in Finding that DCPS Provided an Appropriate IEP in January 2015**

■■■ L.B.'s June 2014 IEP required that she receive 4 hours per month of behavioral support services and 1 hour per month of occupational therapy ("OT"). (AR [9] at 141.) On January 6, 2015, L.B.'s multidisciplinary team ("MDT") reduced these requirements to 3 hours per month of behavioral support services and 20 min-

---

4. *See* D.C. Pub. Sch. Office of Specialized Instruction, *Programs & Resources Guide for Staff* 4 (2014), available at http://dcps.dc.gov/ sites/default/files/dc/sites/dcps/publication/

attachments/GAGA-2015-R0046-AttachmentJ9 OSI14-15ProgramsandResourcesGuidefor Staff.pdf.

utes per month of OT. (AR [9] at 271–80.) Plaintiffs contend that the Hearing Officer erred in finding that these reductions were "reasonably calculated" because he did not consider the "totality of the evidence" and improperly ignored L.B.'s ensuing behavioral problems in January and February 2015. (Pls.' Mot. [12] at 19–21.)

At the Administrative Hearing, L.B.'s behavioral therapist, Ms. Dessin, testified about L.B.'s behavior during the 2014–15 school year. Ms. Dessin testified that L.B. did not exhibit major behavioral problems during the fall semester aside from the incident on October 29, 2014, when L.B. was restrained. (AR [10] at 925, 938.) Ms. Dessin stated that, throughout the fall semester, L.B. "was compliant, she was on task, she completed tasks as assigned, she was cooperative," and "she was interacting well with peers and adults." (AR [10] at 925, 931.)

By December 2014, L.B.'s behavior was improving relative to her behavior during the 2013–14 school year. L.B. was exhibiting "on-task behavior approximately 90% of the time," far exceeding her initial goal of a 25% increase in concentration and staying on-task. (AR [9] at 266.) On L.B.'s IEP progress report, Ms. Dessin labeled L.B. as "Progressing" and indicated, "At this time, it appears she has mastered this goal, but mastery will not be indicated based on her previous history of behavioral issues and considering that she is in a new school setting for 2014–15." (*Id.*) Based on L.B.'s progress, on January 6, 2015, Ms. Dessin recommended that the MDT reduce L.B.'s behavioral support services from 4 hours per month to 3 hours per month, which they did. (AR [9] at 271–80, [10] at 931, 941.) Ms. Dessin testified that she could make that suggestion without a formal evaluation of L.B. because she was not recommending a full termination of services. (AR [10] at 940.) Although L.B.'s

IEP progress reports and service trackers were not before the MDT in January, Ms. Dessin relied on her personal knowledge of L.B.'s progress and on L.B.'s daily behavior charts in making her recommendation. (AR [10] at 845–46, 931–34.)

By December 2014, L.B.'s occupational issues were similarly improving. L.B. was able to "redirect her attention . . . without assistance" when she would lose focus and was using noise-cancelling headphones in the classroom to minimize distractions. (AR [9] at 267.) On L.B.'s IEP progress report, L.B.'s occupational therapist, Ms. Chilana, labeled L.B. as "Progressing" and indicated, "It should be noted that [L.B.] does not present sensory difficulties within the classroom." (*Id.*) Based on L.B.'s progress, on January 6, 2015, Ms. Chilana recommended that the MDT terminate L.B.'s OT, but the MDT instead reduced L.B.'s requirement from 1 hour per month to 20 minutes per month. (AR [9] at 271–80.) Ms. Chilana did not testify at the Administrative Hearing, but Ms. Mays, another occupational therapist who had performed an initial assessment of L.B. in December 2013, testified that Ms. Chilana could reasonably make a recommendation as to L.B.'s needs without a formal evaluation because therapists are "always assessing and screening every time [they] work with a child." (AR [10] at 890.)

After the January 2015 revision to L.B.'s IEP, however, her behavior deteriorated. On January 7, 2015, L.B. "refused to comply with directions" and was sent to the school office for a "time-out." (AR [9] at 153.) On January 8, L.B. was "defiant," pushed another student repeatedly, and had to be escorted to her special elective by Dean Taylor. (AR [9] at 152.) On January 9, L.B. "refused to complete assignments" and required intervention in order to exhibit self-control. (AR [9] at 151.) On January 12, Langley staff contacted Ms.

Beckwith after L.B. was disrespectful to her teacher. (AR [9] at 150.) On January 22 and on February 5, Langley staff physically restrained L.B. because of her disruptive behavior. (AR [10] at 802–03.) As a consequence, on February 24, 2015, the MDT met to develop a behavior intervention plan ("BIP") for L.B. (AR [9] at 321.)

Plaintiffs' expert witness in school psychology, Ms. Glover, reviewed L.B.'s IEPs, BIP, IEP progress reports, and the functional behavioral assessment ("FBA") and formal evaluations that were performed while L.B. was enrolled at Kimball. (AR [10] at 690.) Ms. Glover did not review L.B.'s daily behavior charts. (AR [10] at 727–30.) Based on her review of the records she was provided, Ms. Glover expressed her opinion that L.B.'s January 2015 IEP was not appropriate and that the MDT did not appear to have "up-to-date information" about L.B. in January 2015. (AR [10] at 694, 724.)

Based on these facts, the Hearing Officer determined that the reduction in behavioral support services and OT in L.B.'s January 2015 IEP was "reasonably calculated." (HOD [9-1] at 16.) He found that L.B.'s clear progress in increasing her concentration and focus necessitated a new behavioral goal—learning coping strategies and improving regulation of emotion. (*Id.*) Similarly, he found that L.B.'s clear progress in managing sensory distractions justified the reduction in OT. (*Id.*) After weighing the testimony of Ms. Dessin and Ms. Nickson against that of Ms. Glover, the Hearing Officer concluded that Ms. Glover's testimony was not sufficiently persuasive for Plaintiffs to meet their burden to show that the reduction in services was unreasonable. (*Id.*)

Plaintiffs contend that the totality of the evidence does not support the Hearing Officer's findings that L.B.'s progress was so clear as to justify the reductions in L.B.'s behavioral support services and OT and that such reductions were reasonably calculated. (Pls.' Mot. [12] at 19–21.) In support of their contention, Plaintiffs argue that (1) based on Ms. Glover's testimony, the MDT relied on insufficient information when reducing L.B.'s therapy services, (2) the MDT failed to consider L.B.'s long-term history of behavioral problems and to discuss the incident of restraint from October 29, 2014, and (3) L.B.'s ensuing behavioral problems demonstrate that her January 2015 IEP was inappropriate. (Pls.' Mot. [12] at 19–22; Pls.' Opp'n to Def.'s Cross-Mot. [18] at 9.)

Defendant responds that (1) Ms. Glover did not review L.B.'s daily behavior charts, which were an important source of information from which the MDT could have determined L.B.'s educational needs, (2) the MDT was justified in ignoring the incident of restraint from October 29, 2014, because the MDT reasonably believed that L.B's long-term history revealed that her behavioral problems generally occurred when she was not taking medication, and (3) Plaintiffs' *ex post facto* evidence is irrelevant because the Hearing Officer correctly analyzed L.B.'s IEP prospectively rather than retrospectively. (Def.'s Cross-Mot. [15] at 28–29; Def.'s Reply to Pls.' Opp'n [19] at 6–7.)

 In reviewing the substance of a student's IEP, the Court asks whether the IEP was "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207, 102 S.Ct. 3034. In doing so, the Court does not ask if the IEP "was adequate in light of [the student]'s subsequent progress." *S.S. v. Howard Rd. Acad.*, 585 F.Supp.2d 56, 66 (D.D.C.2008). Rather, "the Court must ask whether the IEP was appropriately designed and implemented so as to convey a meaningful benefit to [the student]." *Dist. of Columbia v. Walker*, 109 F.Supp.3d 58,

66 (D.D.C.2015). This standard "must take into account what was, and was not, objectively reasonable ... at the time the IEP was promulgated." *Roland M.*, 910 F.2d at 992 (internal quotation marks and citation omitted). Because "an IEP must be evaluated as of the date it was created," *Walker*, 109 F.Supp.3d at 66, any evidence that was unavailable to the MDT when they developed the IEP "may be considered only with respect to the *reasonableness* of the district's decision at the time it was made," *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 762 (3d Cir.1995) (emphasis original).

After reviewing Plaintiffs' arguments, the undersigned is not persuaded that L.B.'s January 2015 IEP was inappropriate. First, Plaintiffs' argument that the MDT had insufficient information before them at their January 2015 meeting is unconvincing. Ms. Nickson and Ms. Dessin both participated in the January 2015 meeting and supported the revisions to L.B.'s IEP based on their extensive personal experience in working with L.B. (AR [10] at 819–820, 931–34, 941.) Ms. Dessin testified that she also relied on L.B.'s daily behavior charts in making her recommendation at the January 2015 meeting. (AR [10] at 931–34.) Ms. Glover, who was not present at the January 2015 meeting, was the only witness who testified that the MDT relied on insufficient information at their January 2015 meeting. (AR [10] at 694, 724.) However, Ms. Glover based her conclusion partly on L.B.'s IEP progress reports and service trackers, which the MDT did not consider when they drafted her January 2015 IEP. (AR [10] at 690, 845–46.) Ms. Glover did not consider L.B.'s daily behavior charts—upon which Ms. Dessin relied—and conceded that the daily behavior charts were an adequate source upon which L.B.'s needs could reasonably have been determined. (AR [10] at 726–30, 931–34.) Thus, the undersigned agrees

with the Hearing Officer that Ms. Glover's testimony does not convincingly demonstrate that the MDT lacked accurate data upon which they based their decision to reduce L.B.'s behavioral support services and OT.

Second, Plaintiffs' argument that L.B.'s January 2015 IEP was unreasonable because the MDT failed to consider L.B.'s long-term history of behavioral problems, particularly the restraint incident on October 29, 2014, is meritless. At their meeting on January 6, 2015, the MDT focused on the progress L.B. had demonstrated at Langley during the previous four months. (AR [10] at 941.) Ms. Beckwith objected to the reductions based on L.B.'s history of behavioral problems at Kimball. (AR [10] at 1013–14.) However, as Plaintiffs' expert witness Ms. Glover testified, "it's important to include up-to-date information" when making decisions concerning a student's educational and behavioral needs. (AR [10] at 694.) Accordingly, it was not unreasonable for the MDT to focus more prominently on L.B.'s past four months of progress at Langley than on L.B.'s behavioral history from when she was enrolled at Kimball.

Moreover, L.B. told Ms. Nickson and Ms. Dessin that her outburst on October 29, 2014, was caused by lack of medication. (AR [9] at 248, [10] at 808, 936–38.) Ms. Nickson testified that she shared this information with other MDT members. (AR [10] at 808–09.) Even though Ms. Beckwith testified that she sometimes administered L.B.'s medicine by hiding it in her food, Ms. Beckwith did not inform the MDT of this fact until their meeting on February 24, 2015, more than one month after they had already revised L.B.'s IEP. (AR [10] at 646–47, 852.) Accordingly, in January 2015, it was reasonable for Ms. Nickson, Ms. Dessin, and other members of the MDT to ignore the restraint incident on

October 29, 2014, because at least two members reasonably believed it was a unique circumstance attributable to a lack of medication that did not warrant increased intervention. (AR [10] at 808–09, 936–38.) Thus, the MDT's determinations were not unreasonable in light of L.B.'s long-term history and the restraint incident on October 29, 2014.

▮ Lastly, the undersigned does not believe that L.B.'s ensuing behavioral problems establish that her January 2015 IEP was inappropriate. To avoid hindsight bias, courts consider *ex post facto* evidence "only with respect to the *reasonableness* of the district's decision at the time it was made." *Susan N.*, 70 F.3d at 762 (emphasis original). Although L.B.'s deteriorating behavior may be evidence that her January 2015 IEP did not provide her the best possible education, it does not demonstrate that her IEP was unreasonable. Defendant "need not guarantee the best possible education or even a 'potential-maximizing' one.... Instead, an IEP is generally 'proper under the Act' if 'reasonably calculated to enable the child to receive educational benefits.'" *Leggett v. Dist. of Columbia*, 793 F.3d 59, 70 (D.C.Cir.2015) (citations omitted). In reviewing the information before the MDT when it met on January 6, the undersigned believes that L.B.'s IEP was reasonably calculated to benefit L.B. educationally. Therefore, the undersigned recommends that the Court uphold the Hearing Officer's finding on this claim.

### E. The Hearing Officer Did Not Err in Finding that DCPS's Failure to Develop a Behavior Intervention Plan Did Not Deny L.B. a FAPE

▮ Plaintiffs contend that the Hearing Officer erred in finding that DCPS was not obligated to develop a behavior intervention plan ("BIP") for L.B. prior to February 24, 2015. (Pl's Mot. [12] at 24–25.) L.B.'s previous school, Kimball, had drafted a BIP for L.B. in December 2013 but did not finalize it before L.B. was transferred to Langley for the 2014–15 school year. (AR [9] at 316–17, [10] at 925–28.) Langley did not draft a BIP for L.B. until after she exhibited repeated behavioral problems in January and February 2015. (AR [9] at 321.) Accordingly, Plaintiffs contend that the Hearing Officer's finding that L.B. was not denied a FAPE by DCPS's failure to develop a BIP until February 2015 was erroneous. (Pl's Mot. [12] at 25.)

L.B. was enrolled at Kimball for the 2013–14 school year. (AR [9] at 37.) Kimball performed a functional behavioral assessment ("FBA") of L.B. in December 2013. (AR [9] at 49–52.) The FBA recommended L.B. be provided with behavioral support services, a daily behavioral chart, a classroom seating chart, increased classroom responsibility, and incentives for work completion. (*Id.*) However, the BIP that Kimball drafted thereafter was not finalized before L.B. was transferred to Langley. (AR [9] at 316–17, [10] at 925–28.)

Nevertheless, L.B.'s multidisciplinary team ("MDT") did consider Kimball's FBA when drafting her initial IEP in February 2014. (AR [9] at 70–72.) L.B.'s initial IEP provided for behavioral support services, daily progress reports, and a color flip chart to track behavior. (AR [9] at 77–85.)

Thereafter, Ms. Byrnes, who had completed the FBA of L.B. at Kimball, attended the meeting at which L.B.'s MDT drafted her June 2014 IEP. (AR [9] at 122.) This IEP included the same behavioral provisions as the February 2014 IEP, as well as providing for a seating chart and including a note concerning the need for behavioral intervention. (AR [9] at 122–44.)

While enrolled at Langley, L.B. completed daily behavioral assessments four times each day. (AR [9] at 148–229.) L.B.'s classroom also contained a behavioral technician, who assisted the students in completing their assessments and offered "in-the-moment" redirection when required, and an instructional aide, who assisted in implementing the students' IEPs. (AR [10] at 775.) Ms. Nickson implemented an incentive system by which students could earn extra computer time or prizes when they were well-behaved. (AR [10] at 798.) L.B.'s FBA from December 2013 had suggested computer time as a means of positive reinforcement. (AR [9] at 49.)

In light of these behavioral interventions provided in L.B.'s June 2014 IEP and implemented in her classroom, the Hearing Officer determined that Langley was not initially obligated to develop a BIP for L.B. (HOD [9-1] at 17–18.) He also determined that Langley appropriately drafted a BIP for L.B. in February 2015, only one month after L.B. exhibited repeated behavioral problems. (HOD [9-1] at 18–19.)

 In a situation where a school fails to draft a BIP for a student, that failure may render the student's IEP unreasonable if the student's IEP team does not "review" the FBA and "consider the use of positive behavioral interventions and supports, and other strategies, to address" the behavioral problems identified in the FBA. 20 U.S.C. §§ 1414(c)(1)(A), (d)(3)(B)(i); *see also Harris v. Dist. of Columbia*, 561 F.Supp.2d 63, 68 (D.D.C.2008) ("[T]he information gleaned from the assessment is central to formulating an IEP tailored to the needs of individual disabled children.") Therefore, where a BIP is absent, the Court must review substance of a student's IEP and ask, in light of the FBA, whether the IEP was "reasonably calculated to enable the child to receive educational bene-

fits." *Rowley*, 458 U.S. at 207, 102 S.Ct. 3034.

Plaintiffs argue that the failure to develop a BIP for L.B. was a decision "not reasonably calculated" and thus denied L.B. a FAPE. (Pls.' Mot. [12] at 25.) Plaintiffs contend that the behavioral interventions provided in L.B.'s IEP and implemented in her classroom were inadequate because they were not sufficiently individualized or based on her FBA. (Pls.' Opp'n to Def.'s Cross-Mot. [18] at 11.) Plaintiffs also point out that L.B.'s social worker, Ms. Dessin, testified that she had expressed concerns to Ms. Nickson about the lack of a BIP for L.B. at one point near the beginning of the school year. (AR [10] at 925–28.) Plaintiffs contend that Ms. Dessin's concern demonstrates that Langley was obligated to develop a BIP for L.B. prior to February 2015. (Pls.' Mot. [12] at 24.)

Plaintiffs' argument is unavailing. Nearly all ·of the recommendations from the initial FBA of L.B. were included in her IEP or implemented in Ms. Nickson's classroom. (*See* AR [9] at 148–229, 316–17, [10] at 775, 796, 801.) The record also shows that L.B.'s IEP team considered Kimball's FBA when drafting L.B.'s initial IEP in February 2014. (AR [9] at 70–72.) Additionally, as the Hearing Officer noted, DCPS developed a BIP on February 24, 2015, only one month after L.B. exhibited repeated behavioral problems in January. (HOD [9-1] at 18–19.) Because Plaintiffs have not provided evidence that Langley's failure to develop a BIP rendered her IEP substantively deficient, the undersigned recommends that the Court uphold the Hearing Officer's finding that L.B. was not denied a FAPE by DCPS's failure to develop a BIP prior to February 2015.

## IV. RECOMMENDATION

For the reasons stated above, the undersigned recommends that Plaintiffs' motion

for summary judgment be granted in part and denied in part and that Defendant's cross-motion for summary judgment be granted in part and denied in part. Specifically, the undersigned recommends granting Plaintiffs' Motion as to their claim that Defendant denied L.B. a FAPE by violating DCPS guidelines on the use of restraint and by failing to implement her IEPs. The undersigned recommends denying Plaintiffs' Motion as to their claim that Defendant denied L.B. a FAPE by placing L.B. at Langley for the 2014–15 school, by failing to develop an appropriate IEP in January 2015, and by failing to develop a BIP until February 2015.

## V. <u>REVIEW BY THE DISTRICT COURT</u>

The parties are hereby advised that under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to the Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the report and/or recommendation to which objection is made, and the basis for such objections. The parties are further advised that failure to file timely objections to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

DATE: <u>6/27/2016</u>